Today's cases are No. 25-1343, Commonwealth of Massachusetts et al. v. National Institutes of Health et al., Case No. 25-1344, Association of American Medical Colleges et al. v. National Institutes of Health, and No. 25-1345, Association of American Universities et al. v. Department of Health and Human Services et al. At this time, would counsel for the appellants please introduce yourself on the record to begin. Good afternoon, Your Honor. My name is Jennifer Utrecht and I represent the government. I would respectfully request seven minutes for rebuttal. Um, sure. You may. Good morning, Your Honor. Jennifer Utrecht. An issue in this case is plaintiff's challenge to an NIH announcement that it will no longer pay the negotiated indirect cost reimbursement rates that were incorporated into the existing grant awarded to institutions of higher education and that it would instead pay an across-the-board rate of 15% to that class of federal awardees. The Tucker Act precludes district court jurisdiction over this case. As the Supreme Court has recognized to the Department of Education in the APHA case, the APA's limited waiver of sovereign immunity precludes district court jurisdiction over any challenge in which another statute precludes the relief sought. The Tucker Act, of course, provides exclusive jurisdiction over any claim based in an express or implied contract with the United States, which these grants between the federal government and these institutions, of course, are. And the Tucker Act provides damages for a breach of contract, but it does not permit specific performance of the contract, which is effectively the relief that the district court ordered here. Counsel, would you agree that Justice Barrett's concurrence in the APH case controls how we should read the precedential significance of that decision? Justice Barrett is the fifth vote in the APHA case, so, of course, her opinion is the controlling decision. She very clearly distinguishes between challenges to a directive that underlined the decisions on the grants in that cases and with respect to a challenge to a directive, which I would suggest is analogous to the policy change that we have at issue here, that there's no question that the district courts have jurisdiction to address that challenge to the directive, which is very different than a challenge to a specific grant determination. Why doesn't that answer the jurisdictional question? If you read Justice Barrett's concurrence, I think we're in agreement on many points with respect to your analysis of that. First, that the termination decisions at issue in APHA, there was no jurisdiction over them. The Supreme Court held that the reason there was no jurisdiction over them was because to vacate that agency action, that termination announcement, would be an order that is designed to require payment under the contract. By contrast, Justice Barrett drew out a distinction between that agency action and a separate agency action, which was a series of e-mails, guidance, documents sent inside of the agency about various factors and considerations that the agency should be applying when making case-by-case determinations with respect to grants in the future. Here, and I think this is where I disagree with Your Honor's assertion in the question presented, here what we have looks identical to that first set. We have an announcement by the agency. It's not a series of decisions that are applied to future contracts, but as to the existing grants, we have an announcement by the agency that it is not paying the higher rates. I'm sorry. There are no grant terminations at all in this case. Isn't that correct? It was not a grant termination that's correct, Your Honor. The grants remain in effect. This is maybe oversimplifying it, but it does resemble a partial termination. It's effectively saying this pool of money that we agreed to, we are only paying a portion of it. I want to emphasize that, of course, if the federal government had just not paid this money, that would, of course, be a breach of contract that could be brought in the court of federal claims, and the relief that plaintiffs could potentially get would be damages, but they would not be able to get an order for specific performance requiring continued payments over the terms of the contract for the entirety of the award. Counselor, can I just follow up with you about that? I'm struggling a bit with your argument that since I'm familiar with the APHA case and the breakdown of what was at issue there, there were the challenge directives, and then there were the actual individual grant terminations that flowed from the challenge directives, and the challenge directives were broad agency-wide policies, and it seems to me that what we're looking at here is also a broad agency-wide policy that's going to apply to all grants, so I'm just wondering how ... I'm not quite following your argument that this is actually more like the individual grant terminations rather than the agency-wide policy that a majority of the Supreme Court justices in the APHA said could be challenged under the APA, and therefore the district court did have jurisdictions aside. How is this similar to the individual grant determinations when it applies to all grants on a going-forward basis? The two points you're on, the first that I would note is that I understand that there may have been some inartful language, and the district court found that this document applied to all grants, but it's my understanding, as we told the district court, as we represented in our brief, and as NIH has confirmed with me, that this has always been a deviation for a class of awards only with respect to institutions of higher education. It does not cover all federal grants by NIH. Counsel, can I ask you about that? I saw that in your brief, and I am really struggling with that argument because, as you know, we have to follow ... The plan text is supposed to be the number one place we start whenever we're looking at something that the government has done, and literally the first five words of the supplemental guidance say, for any new grant issued, so I'm really struggling with the argument that, in fact, it's not for any new grant issued. So, again, Your Honor, my understanding is that this may have been inartful language and that it was always intended to only apply to institutions of higher education, but I would also note, even if this court is unwilling to accept that, that even plaintiffs acknowledge that for existing grants, which is the only argument ... Our Tucker Act argument only applies with respect to these existing grants. If plaintiffs had framed a different claim only challenging this announcement as applied to future grants as a policy going forward, there might be other justiciability concerns with that, like standing, but the Tucker Act argument we are presenting here only applies with respect to the challenge to the change to the terms of the existing grants, which, for all the reasons I've explained, resembles the termination ... Why does that matter, I guess, is what I'm trying to understand. Why does that matter, especially if we're trying to figure out what framework we should be applying in and asking for your help in doing that and looking at the orders that we got in the Department of Education case, the APHA case. The APHA case comes out quite differently from the Department of Education case and says very clearly that when you have an agency-wide, a broad overarching policy ... Let's just for a moment say it's not all grants, but it is for a large number of grants. It is an overarching policy that puts in a 15% indirect cost rate cap. How is that not an agency-wide or overarching policy that is exactly what the court in APHA said could be pursued in district court? My top line answer, Your Honor, is the distinction that Justice Barrett drew, and we have to understand this, of course, in terms of the actual holding of the court, the sentence ... The only holding of the court, which was that the APA precludes the district court's in order designed to provide payments under the contract. The reason for that, as I mentioned earlier, is the Tucker Act, which is exclusive for all contract claims, does not permit specific performance. What the order in the district court did was it preserved our stay-in part and reversed our stay-in part. Individual grant determinations, which, as Judge Lupe has pointed out, aren't at issue here. There was not jurisdiction over it, but the overarching agency guidance, which is called the directive there, there was. How does that link to the overarching guidance? When we start with that principle, I think that informs how we should understand Justice Barrett's controlling opinion, which is the guidance documents at issue in APHA, you could They might one day, she recognized, lead to payment, but vacating them, they were separate from any payment decision. Here, with respect to existing grants and the change to the terms of existing grants, vacating it, there is no difference between the agency's announcement and the decision to make payment, just like there was no difference in APHA and Department of Education between the termination announcement and the decision to make payment. They are inextricably intertwined. If you vacate the agency's announcement that it's not making the payment, that is an order designed to require payment under the contract. I have to say, it seems to me, the very argument that you're making, that this all happens in one fell swoop, puts you in the position of being very much at odds with the way the regulatory scheme applies here. Before I get to that, can we turn to the merits? I'd be happy to address questions you have on merits, Your Honor. I'd like to ask you, I think in fairness, I should tell you how I read the rider, which I think is quite critical in this case, and I'd like you to tell me what's wrong with the way that I read it. I'm looking at the first sentence of the rider, which I think tells the agency that the regulatory provisions in Part 75 basically cannot be changed. As they applied in the time period indicated, they continue to apply. They cannot be changed. Then I go on to the second sentence, and I'm talking about the first part of that second sentence, and I'll quickly read it to you. None of the funds appropriated in this or prior acts are otherwise made available to the Department of Health and Human Services or to any department or agency. They'd be used to develop or implement a modified approach to such provisions. It seems to me, and this is what I'd like you to please respond to in addition to whether that's the right way to read this, it seems to me what has been done here is unquestionably a modified approach to the deviations that are provided for in the regulation. This across the board, 15 percent cap on indirect costs, it's not just a modified, it's a dramatically modified approach to the deviations that are contemplated in the reg. What is wrong with that reading of the rider? I would suggest that might be the end of the story, if that's the proper way to read the  The proper way to read the rider is that Congress was telling the agency to continue to follow the regulations. The argument that this was a violation of rider really isn't an independent ground from the district court's finding that we had violated the regulations here. The question, of course, I know in your case the question is whether we've followed the regulations. I agree that what Congress did in the appropriations bill is to tell the agency to continue to follow the regulation that existed in 2017. I agree that with respect to the second provision you read, that no appropriated funds shall be used to adopt a modified approach. What that does is prohibit the agency from spending any appropriated funds to develop a new regulation to revise the existing regulation. What Congress told us is to continue to use You read that provision that I quoted to say nothing more than what the first sentence said. It simply means that you cannot revise the regulations themselves. It doesn't mean that you can't apply those regulations in a fashion that results in a modified approach. Is that what you're saying? There probably is some room to read the appropriation also as saying you could not interpret that existing regulation in a manner that would effectively do something different than what it says. For example, if you issued a guidance reinterpreting the regulation, something like that nature, that might fall within that second clause. But here, the agency did not, as we've explained, has not violated the regulation. The regulation plainly contemplates deviations for a class of awards. As Congress did not want there to be a deviation for a class of awards, it surely could have in the appropriations right or said no deviations for classes of awards, but that's not what Congress did. I also think it's important to note, Your Honor, of course, this was done in response to a budget proposal that proposed an across-the-board limitation on spending, which is different than what's happened here. The policy itself says we would like to reduce the amount of indirect costs for institutions of higher education so that we can reallocate that money to direct research costs. We can move the money around and still spend the exact same amount of money as opposed to the budget proposal that Congress was responding to, which was an overall cut to all research spending by reducing the amount of indirect costs. And so when Congress... Isn't that inconsistent with what the district court found based on what the government, I think, tweeted out right afterwards, which is that this is going to be effective this year, a $4 billion cost savings? So it's true that there was a social media post, and context is often lost, nuance is often lost in social media posts that said this would be a $4 billion cost savings. But the policy itself, which I think more than a social media... That was a statement by the government, right? It was a social media post by NIH's official account, yes. But the policy itself says that this money will be redirected to direct research costs. There's never a statement that we are cutting overall spending in this policy. And so to the extent that the social media post is inconsistent with that, and I would argue it's not inconsistent, it's just missing the nuance of what's being... It's $4 billion savings in indirect costs, but that doesn't mean it's $4 billion overall savings. It doesn't mean that money isn't going to be spent. The policy itself would control here, and the policy itself says that this money is being sent to direct costs, which is different than the original budget proposal that Congress was responding to. And that's significant also, Your Honor, because plaintiffs here have noted that this third provision of the appropriations rider, which says that the overall fiscal effect shall not be changed, that just shows what the agency has done is consistent with the appropriations rider. Congress was concerned in making sure the same amount of money was being spent, and that's what happened here. We were reallocating the money, not reducing the overall amount of money that was spent. But in order for us to agree with you, with your argument on this particular point, we do have to disregard what the government itself said about this is going to be an immediate savings of $4 billion this year, don't we? I think you would be reading that statement in the proper context and in conjunction with what was actually said in the supplemental guidance of that issue here, which is that this money would be redirected. And there's never been any indication in the record, other than this single statement that just says that there was a cut in direct costs that would result in $4 billion savings, there's never been any indication that this money wasn't going to be reallocated or spent. Of course, money was spent because we've been operating under the district court's injunction when it's stated. I thought I heard you say that a premise in my question was that there had been compliance by the agency with regulations. I just want to be clear, I did not say that. I would suggest that there may be a problem, a failure to comply with the regulations. Let me ask you, this document, that is the entire administrative record, is it not? I mean, this compliance with the regulations by this initiative rises or falls on this three-page document, is that correct? There's no supplemental administrative records, is that right? Yes, I understand, Your Honor. I'm looking at provision 3, 4.14C3, which says that, and again I'll quote, the HHS awarding agency must implement and make publicly available the policies, procedures, and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates. So I gather the policies, procedures, and general decision-making criteria that the regulation requires, it's all in here, is that your position? That's correct, Your Honor. Just looking at that language, why does that not contemplate really a two-step process? This is a sequential argument. I know you're familiar with it. You addressed it in your brief, but that language seems to me to suggest that first, there will be made publicly available the policies and procedures and general decisions that will then be followed if there is to be any deviation from negotiated rates in the context of specific request for the award of a grant. It's a two-step process. But as you said at the very beginning of your argument, this was all done in one fell swoop. I mean, you had, instead of announcing in advance the policies, procedures that would be used, and then considering individual requests for awards, it was all just done at one time. You had this announcement that this 15% cap will apply, henceforth, without any consideration of what individual awards might entail. How is that one-fell-swoop approach consistent with what the regulation requires? Two responses, Your Honor. The first is, of course, for here, it's because you have rejected our argument on jurisdiction. And I would just note that it's important to distinguish, if you'll indulge me for just a moment to give this background, it's important to, I think, distinguish between existing grants, which, of course, is the premises. Plaintiff's complaint here has been that they've made some arguments about future grants, but the whole purpose of the harms, sorry, all of the harms that they've alleged, largely the reason for the injunction was with respect to existing grants. With respect to future grants, of course, there are second steps, because you have to issue notices of awards and things in the future, so there is at least that piece. And I mention this because, again, our Tucker Act arguments, for the reasons we've explained, precluded the district court from vacating any change to existing awards. And so, to the extent we're talking about future awards, I think it's important to assess the merits of those on their own independent terms. There is, with respect to future awards, a second step that would happen in the future, which is the actual issues of notices of awards. But also, and this is more directly to address your question about how this is consistent with the regulation, the regulation doesn't require, we don't view the regulation as requiring a sequential process, and the reason for that is because you can imagine, for example, for individual awards, individual deviations, regulations that you can make deviations for a class or for individual awards, you can imagine that the policies, decision-making criteria, and procedures might be pretty extensive, because you would want to make sure that any decisions as to individual deviations were following the same procedures, that the standards were being applied in a consistent way. When you're talking about a class of awards, of course, that's necessarily going to be more truncated, because you're not deciding how to balance two classes against each other. You're saying, this is the class for which we're making a deviation, here's the policy that's leading us to make this deviation, and the decision-making criteria and procedures are quite short, because we're not contemplating this sort of individualized determination process, which regulations don't require. Are you suggesting that under this scheme, that with respect to the award of individual grants, a potential recipient might be able to negotiate its way out of the application of this 15% cap on indirect costs? Sorry, I think you may have had a misunderstanding. What I'm saying is, this regulation, which sets forth what has to happen for any deviation, even in a hypothetical world, in which we were not announcing a deviation for a class of awards, but we were saying, we are going to start doing individual-based determinations, you would imagine that the policy would say more about how those decisions would be made, what the procedures were, because when we're talking about individual awards, you can imagine there might be a process for that. But it is consistent with the regulation, which contemplates deviations for a class of awards, to have a more truncated procedure, to have an announcement. Here are the policies and decision-making criteria that are leading us to approve a deviation for this class of award. The regulation doesn't require a two-step process. Of course, we could have used one, but nothing in the regulation says, here, announce procedures and then make individual determinations with respect to classes of awards. But what really it is doing is making sure that the public is aware of these deviations. I see that I'm out of time, but if there are any further questions, I would be happy to address them. Mr. Howard? No. Thank you. Thank you, Your Honor. Thank you, counsel. At this time, the counsel for the Appleese American University, so all of the institutions up on the right. Thank you, Your Honors. Paul Clement for the private Appleese, and then my friend, Mr. Kravitz, is going to talk to you from the perspective of the states. If I could begin just with a word of background. Since the 1960s, indirect cost reimbursement has been done under a finely reticulated scheme that involves institution-specific negotiations. It's an elaborate process where the rates for a particular institution are negotiated. There are audits of those rates, and then the rates can vary, if you look at the record in this case, anywhere from 50% to 70% based on the circumstances of the particular universities. Now, this isn't the first time that the Trump administration has expressed some frustration with that longstanding regime and proposed instead an across-the-board, much lower rate of reimbursement. So in 2017, they proposed to Congress a 10% across-the-board cap. The response from Congress was swift and bipartisan and manifested itself in the rider, which I'd love to talk about in just a minute, that in my view has three independent prohibitions that prevent the administration from doing precisely what they did here. And I think it is telling that in the immediate wake of that rider, the first Trump administration understood that language to do exactly that. And it didn't even say that, well, this prevents us from doing this in the way we wanted to, or it very emphatically said this prevents us from not only imposing this across-the-board cap, but redirecting the money into direct cost reimbursement. And so they acknowledged that essentially this rider had the effect of putting the kibosh on this. Your opposing counsel says that part of that background that you just described is really inappropriate for us to even look at that, the minimal legislative history, even the acknowledgement by the administration that they were prohibited at that time by statute from doing what they would want to do. That's all irrelevant. We should just look at the language, interpret the language, decide what it means. How do you respond to that argument of irrelevance? So I would respond in two ways. One, I would say I'm happy to live or die with this text because I think this text is terrific for us. But I would also say I don't think there's a single member of the Supreme Court that takes that view of how you interpret legislative language. And even the sort of most textualist textualists on the current court have distinguished between legislative history, which is digging into what it says in a committee report, and what they call legislative history, where you actually look at the evolution of the legislation and you understand what proposal happened before, maybe what the law said before. And I think this all comes within that latter category of permissible legislative history. And then, as we put in the briefs, there's also this famous phrase that I think goes back to Judge Friendly, that judges aren't required to display a level of naivete that is locked on the average person. And so I think that's when you have a provision like this that nobody had any doubt in 2017 to 2019 what this rider did. And to just ignore that I think would just be a mistaken approach to textual interpretation. But like I said, I'm happy to go to the text. Counsel, can I just turn you back to the jurisdictional issue? Your brief covered the points that you're making about the rider in an extremely helpful way. But I'm still trying to figure out how we're supposed to do the jurisdictional analysis, and I'm hoping that you can help me. The Supreme Court had two very different orders that it issued in the Department of Education case, the APHA case. It's never adopted the megapulse framework, which many suggest we should be using. How are we supposed to do the analysis of whether there's exclusive jurisdiction in the court of federal claims versus whether a district court has jurisdiction in a case where a contract may be the source of the injury, as the government has said? What do you suggest is the way that we proceed with the analysis in light of all the authority we have to date? Sure. I have two suggestions, actually. My lead suggestion, and I think the safest path, is to simply apply APHA as the Supreme Court's latest and greatest word on how to determine the dividing line between district court jurisdiction and court of federal claims jurisdiction. And I think this would be a slightly closer case. I still don't think it would be that close. But I think this would be a slightly closer case if all we had was the Department of Education case and we didn't have APHA. But I think APHA actually makes this quite straightforward. The supplemental guidance here is exactly the analog to the internal guidance that was at issue in APHA. This is a challenge under the APHA and other provisions to that supplemental guidance. That's exactly what Justice Barrett said could go forward in the district court. As Your Honors have alluded to, this is a particularly straightforward case because we don't even have any terminated grants here. So there's really nothing on the other side, the court of federal claims side. So I think that's the safest way to sort of decide this case. You do not suggest we do a, is this a contract claim in disguise? What is the source of the rights? What is the type of release requested? You just say straight up application of what the court said in the APHA order. I think that is the most straightforward way. I dare say maybe it's the safest way for a court of appeals to proceed given the guidance that's come from the Supreme Court. I will offer my sort of back up. Before you go on that point, do you have a succinct response to what I took to be the camel's nose under the tent? We start with the relief and the relief is specific performance. That's an invasion of the Tucker Act. Why is that not correct? Sure, because we're not asking for specific performance really of any one particular grant here. If the government, if one of my many clients defaults in some other way, we don't get specific performance. What we get is a vacature of the supplemental guidance. And if they have some other way tomorrow to try to come at this issue, I mean, we'd have to come back to court. But then we also got an injunction against the kind of what we think is the ongoing violation of the appropriations rider. And that really takes me to the second way to think about this, which is this is a case that belongs in district court under Justice Scalia's dissent in Bowen. So if you're going to take sort of the most pro-Tucker Act, pro-court of federal claims view of this, what I take to be the gravamen of Justice Scalia's opinion is whether the relief, and this really gets to whether 704 of the APA would preclude relief in the district court, and the question is do you have an adequate remedy in the court of federal claims? And if all you're talking about is, well, the difference between a damages remedy for a contract violation and specific performance of the contract, you could sort of say, well, there's adequate remedy with the damages remedy. But that can't stop the ongoing violation of the appropriations rider. The appropriations rider, even before you get to any effect on any contract, tells the agency, you can't spend one penny trying to modify this or change its fiscal effect. And I think we perfectly have standing to challenge that, and the remedy that we would get, which is a damages remedy a couple of years from now for the court of federal claims, that doesn't begin to be an adequate remedy for the appropriations rider violation and what I would dare say is an ongoing violation of the appropriations clause itself if we don't have the injunctive relief. So I think this is really... It is the only cause of action you have available to bring that particular claim. And that particular remedy, and there's no other adequate remedy for that anywhere else, let alone in the court of federal claims. And I dare say you can't sort of reconstruct all this, but if this had been the first case that got to the Supreme Court instead of the DOE case and the APHA case, I think there wouldn't even have been a serious issue about this. This case clearly belongs in the district court. Counsel, can I just ask you one more question on the jurisdictional issue? A lot of these cases have had briefing back and forth about what BOIN means and doesn't mean, but when I was re-reading BOIN, BOIN really doesn't deal with the particular argument that the federal government is making here about the part of 702 that says this, you know, it's sort of the implicit language, the second half of 702, that this isn't about the money damages part of 702 and they haven't invoked 704 as far as I'm aware. So what do you think is the relevance of BOIN to this particular case? I understand you think Justice Scalia's defense helps you, but just more generally, do you think BOIN is really that on point for the particular issue we have? I mean, I think so. I mean, I think if all we had is BOIN and we didn't have Department of Education and we didn't have APHA, I mean, you know, I might point you to the Crowley case from the D.C. Circuit, some other cases to help you, but I think without the Department of Education case, this would, again, have been a straightforward case to get you into district court. What part of BOIN is what I'm wondering about? Because, again, they were focused on a different part of 702 and then 704. I guess the entire thrust of the BOIN case, and, again, I think, you know... The changes to the APA were meant to broaden the avenue for bringing causes of action against agency actions that were, you're just saying, the very general appeal. Exactly, and, you know, the government seems to be arguing, and it starts to seem very much like some kind of implicit restriction on the express grant of authority. And, you know, in general, I think those are disfavored. I think the thrust of BOIN is to sort of err on the side of providing relief in the district court and the most complete relief possible. But at the end of the day, I think because of the appropriations rider issue, this becomes like an incredibly straightforward case because we have a very serious statutory injury even before you get to any specific grant. The only other thing I would say is just as a contextual matter, you know, it's pretty obvious this is an APA case. I mean, we don't even have the, you know, particular grants under the record in this case. It's just not a case about sort of payment under particular grants. It's about this supplemental guidance, and that's why it fits so nicely into that APHA framework. It is a complaint about the supplemental guidance, some of the complaints about sort of, you know, the fact that it's arbitrary and capricious, doesn't address retroactivity and reliance concerns, all of those things, classic APA issues, not classic breach of contract issues at all. So, again, if we were on a clean slate with just BOIN, I would love my chances of staying in district court. And I think whatever sort of like signals were sent by the Department of Education case, by the time you get to APHA, this is straightforwardly in district court. So if I could turn to the merits just for a few moments here. I would like to start with the appropriations rather, and I would like to now go to the plain text of it, because I see three different prohibitions here, and I think the administration managed to go three for three and violated all three of the prohibitions. And just on the first, and I would just like to add one bit of nuance to Judge Whitmer's sort of adumbration of the provision there. I do think the very last words in that provision, that first sentence, are important, because it's not just that the agency shall continue to apply the indirect cost regulations, but they shall continue to apply to the NIH to the same extent and in the same manner as such provisions were applied in the third quarter of fiscal year 2017. So it's not just continue to apply those regulations. It's continue to apply those regulations in the same manner as you did in the third quarter of fiscal year 2017. And as we note in the briefs, this appropriations rider has been repeated every appropriations cycle, and the current one still refers back to the third quarter of 2017. So it's a clear question of direction. Keep on doing it the way that you were doing it in the third quarter of 2017. And that is not what we have here. At that time, weren't they allowed to seek deviations? Weren't they saying because they didn't? Yes, exactly. They might have the theoretical ability to do it. I don't think they had the theoretical ability to go to a 15% across-the-board cap consistently with the regs. But the point is they hadn't done it. And so if they start doing it, that's not in the same manner as it was applied in the third quarter of 2017. Now then as to the next one, none of the funds appropriated in this or prior acts may be used to develop or implement a modified approach to such provisions. Well, I think we're clearly here on a very modified approach, a fundamentally changed approach. So I think they violate that one. And then perhaps most clearly of all, the third provision, because it's the same sentence, but there's a disjunctive or, so I read it as saying none of the appropriated funds in this or prior acts may be used to intentionally or substantially expand the fiscal effect of the approval of such deviations. And I think it's important to focus on that. It doesn't say to substantially expand or change the fiscal effect on the whole funding mechanism. It says the fiscal effect of such deviations. And that's why that post or tweet, whatever it was, is so damning for the government because that's the government advertising that these deviations are going to save us $4 billion. Now it doesn't matter under the text of the appropriations rider if you say with the best of intentions and your fingers crossed that you're going to take those savings and you're going to pour every dollar into direct costs. That still doesn't change the fact that there's a $4 billion deviation or change in the fiscal impact of such deviations, deviations from the indirect costs. And again, I think it's so telling that that's exactly what the administration understood in 2019. So what is your definition of fiscal impact as used here as opposed to what I take to be the government's definition of, you know, overall up or down in expenditure and the appropriation, which I don't think you can do anyway. Yeah, my definition for purposes of this argument, we live in an alternative argument. You could look at the fiscal effect on the schools, if I may finish my answer. But for purposes of this argument, I'm looking at just the fiscal effect that the text of the statute directs you to, which is the fiscal effect of the approval of such deviations. So here, even on their theory that they're going through the regs and they're approving deviations, they're saying the approval of the deviations of the indirect cost reimbursement saves them $4 billion. Now, they say they're going to plow that back into direct cost, but that's what, in 2019, and I'm happy to take any other questions, but otherwise I'll finish on this. The 2019 OMB response in the budget process said, quote, NIH has been prohibited by law from reducing grantee administrative costs and shifting these resources to support direct research. So they understood in 2019 that the effect of this rider did not allow them to save $4 billion a year, but netted out by having $4 billion more in direct cost. They read the rider in 2019 the same way I'm reading the rider today, which is once you save $4 billion from the deviations, you're done. You've violated the rider. I just want to have another question. Please, I have another question, too. Go ahead. Could you just respond to the federal government's argument that all this rider did was tell the agency to continue applying its regulations? So I don't think that works as a textual matter for all the reasons I just said. If you walk through the text, there's three prohibitions. None of them say just go ahead and follow the current sort of regulations. Here's the other reason it doesn't work contextually, and I think the amicus brief, NACUBO is the acronym, but there's a non-congressional amicus brief here, does a really good job of laying out sort of the history of the back and forth between Congress and the executive branch. And I think part of the reason the appropriations rider is written the way it is is Congress understood that the existing regulations were indirect cost negotiation, negotiated indirect costs. The last thing Congress thought is that there was some way to sort of get to a 10% across the board cap or a 15% across the board cap by faithfully applying these regs. They thought the regs themselves sort of were the status quo that they were preserving. Now, I think they did that in a textual matter beyond all doubt by not just saying, you know, don't modify the regs, but when they. . . You're saying the background factual context against which they were legislating. Since she's the deal.  Yes, thank you. I think everyone, the parties agree that this 15% cap is a dramatic departure from what you would describe as the longstanding approach to negotiating these individual indirect cost agreements. As a principle of administrative law, when there is that kind of dramatic change in policy, the agency has arguably a burden of justification that it might not otherwise have. I have alluded to the very brief document, the supplemental guidance, which invokes being a better steward of public funds, the difficulty of overseeing the indirect costs, the comps for private foundations. Those are basically the reasons that are offered for this dramatic policy change. You spend a lot of time, I guess in the aggregate that we spend a lot of time, poking holes in those rationales. What latitude do we as a court have in exploring those rationales? If they seem reasonable, is that good enough? Or can we really probe in some depth how reasonable they really are? What latitude do we have as you see it? I think you have substantial latitude to go beyond just the superficial. I think once you get beyond the superficial, these do not satisfy the requirement for reasoned decision under the APA. As to the specific rationale, the way I read the Fox case and the Encino case is they have a slightly higher burden, and you have a correspondingly greater role to explore how they deal with acknowledging the degree of the change and the reliance interests that are implicated by the substantial change. I think that's one of the many ways in which the agency fell down here in this very short three-page document. But I think even as to addressing important aspects of the problem, which is the classic form of APA review, I don't think they begin in this provision to counter that. I don't want to take us off course, but this would look different, and the judicial role, I think, would look a little different if this had proceeded on notice and comment. Because then as part of the notice and comment process, there would be specific complaints by my clients who would say, wait a second, this is crazy. We're getting 70% indirect reimbursement costs, and you're putting us down to 15%, and that's going to have all these negative effects, and you can't defend 15% as a reasonable approximation of our actual indirect costs, because you went in and interviewed us, and specifically at our institution, you said it was 70%. So if they're doing the notice and comment process, then I think you'd be in a position where there would be specific sort of complaints, and the agency would address them, and then maybe you could sort of, you know, you wouldn't fly-spec the agency, but you would evaluate whether those were, I think your phrase of reasonable responses to those comments is an appropriate sort of snapshot of the standard. But when the agency, putting aside whether they had to do notice and comment, but when the agency just does something like this and doesn't begin to address some of the significant aspects of this, I mean, just to pick one detail, like, you know, if you get into the preexisting regulatory regime, there's actually a 26% cap on the administrative costs, which is only half of the administrative and facilities costs. And so what the agency has done here is, in a preexisting world where there was a 26% cap on half of all indirect costs, they've now adopted a total limit of 15% that's below the deming limit. Now, like, geez, that seems like that is an important aspect of the problem. And that's not something, again, notice and comments, we would have pointed that out, they would have responded to it, you could respond to it. But now I think you're in a situation where you're reviewing this very bare administrative record, and I think it's going to be quite easy for you to say there are important aspects of this problem that just weren't addressed in this administrative record at all. I hope that's responsive. That's helpful. Yes, thank you. Thank you very much. Thank you, counsel. At this time, the counsel for the appellees. The Commonwealth of Massachusetts will all please introduce themselves on the record. Good afternoon. May it please the Court, I'm David Kravitz from the Commonwealth of Massachusetts on behalf of the plaintiff states. Scientists cannot do science if they don't have laboratories in which to do it. That, sort of in a nutshell, is what this case is about. The indirect costs that are at issue in this case support the construction, the maintenance, the upkeep of the physical facilities in which science is conducted and in which the investigators that NIH says it wants to support have to do the work that they want to do. It also supports the sort of the human infrastructure that is necessary for scientific research to occur. The administrative personnel, the technical personnel, the information technology personnel, all of these things are part of indirect costs because they cannot be charged to a single project and, therefore, they're not part of the direct cost structure. Wouldn't you agree with the opposing counsel there is something inherently a little bit elusive about indirect costs and how you audit them? I mean, direct costs, you look at the salaries of the people doing the project. You look at the cost of the supplies that are necessary to do the research. I mean, indirect costs are spread across a spectrum of projects, and it's much more difficult to get a sense of how those should be reimbursed. Isn't that a fair point that it's just inherently more difficult? No. In a word, I don't think it's a fair point with respect to the government. So they say in the notice, of course, that indirect costs are difficult to oversee. The problem is that, as my colleague described to some extent, there is an extensive process that has been in place for 60 years. There's an entire series of appendices in CFR that is devoted to explaining how the process works. There's an entire subpart in 45 CFR Part 75. Subpart F is about audits. It's all about auditing the expenditure and the reimbursement of costs. There are provisions about how costs are. If there's cost overruns, what do you do? If there's cost underruns, what do you do? If there's a dispute, what do you do? And, again, it's a negotiation. So it's not like the universities come in and say, you know, I want X number. They go through this. The universities have to justify the rates that they are asking for. The agency presumably negotiates with them, and they arrive at a number. So if the numbers say they're difficult to oversee, they have to explain why that's the case. And this comes back to a point to sort of jump ahead to the merits, I guess. Part of the arbitrary and capricious inquiry is, you know, are they just making conclusory statements as to whether they as to, you know, to sort of justify the position that they're taking. And, you know, just saying that, you know, indirect costs are hard to oversee, as well as some of the other things in the notice, are the definition of a conclusory statement. And M.C. Delmora Carr's, I think, is really helpful on this. It says, particularly where there are serious reliance interests at stake, and I'm happy to talk about the hundreds of pages of declarations in this case, which are uncontested and which establish the nature of the reliance in this case. Where there are serious reliance interests at stake, conclusory statements are not sufficient. And M.C. Delmora Carr's, you know, not for nothing, is a much better case for the agency than this one. Because there, at least, the agency went through notice and comment. They put out their proposed rule. They did notice and comment. They wrote it up in the Federal Register. They sort of, you know, said, well, these people didn't like it for this reason, and so on and so on. They did what you sort of expect in the administrative process. But then, nonetheless, their conclusions were not sufficiently explained. And at that point, the Supreme Court said, that's not good enough. Similarly, in the DACA case, DHS versus Regents, the court explains the process that you have to go through when there are reliance interests at stake. There cannot be any serious dispute that there are incredibly important reliance interests at stake. Declaration after declaration after declaration in the record explains that this is going to devastate, is a word that appears over and over again in the declarations. I got up to about a dozen, and I stopped counting. They acknowledge those reliance interests. That's why they have taken pains to say that we're not, or they say they have the authority to do it. We're not going to apply this new cap to the date of issuance of the award. We're only going to apply it going forward. So I guess if there's a four-year award, and this policy was announced at the end of year two, they're not going to try to recoup past costs. They're only going to apply it going forward. Isn't that an acknowledgment? No, I mean, I certainly don't agree that they acknowledge the reliance interest. There is nothing in the notice about the kind of impact that this is going to have. I mean, the entire discussion of reliance appears on the second page of the notice, and it says, although cognizant that grant recipients, particularly new or inexperienced organizations, use grant funds to cover indirect costs like overhead, NIH is obligated to carefully steward grant awards to ensure taxpayer dollars, and so on and so on. That's the entire discussion of reliance. There's nothing about the effect on the universities. There's nothing about the recognition that this is what allows the universities to create the physical infrastructure that is necessary for scientists to do the work that they want to do. Cancel. Can I ask you a question about that? When I read that part of the supplemental guidance that says, although cognizant that grant recipients, particularly new or inexperienced organizations, use grant funds in this particular way, taking the federal government's argument that it's made today that this only applies, this new guidance only applies to institutions of higher education, are any of the IHEs new or inexperienced organizations? To your knowledge, are any of the IHEs? Would they fall into that category, just based on your knowledge of who's receiving these grants? None of my clients I would describe as new or inexperienced. None of the state entities are new or inexperienced. I mean, these are all state universities that have been around for a long time. And those are grants in an ongoing process. Absolutely. Absolutely. And most of them have been. So there are a number of declarations that talk about this in some detail. I mentioned in particular the University of Massachusetts declaration has a lot of detail. The Maldonado Declaration from California has a lot of detail about sort of the history of NIH support at these institutions that goes back many, many years. And, of course, for all of that time, NIH has been committed not only to funding the investigators, but also the infrastructure by way of indirect costs. Because that phrase is also new or inexperienced organizations. It's in quotes. I don't know if you noticed that. Can you help us understand what organizations that quoted language might be referring to? I think you'd have to ask the government that question. But I think what that reflects is part of sort of the profound misunderstanding of what indirect costs do and what they support because it sort of suggests, well, maybe new organizations that are just getting off the ground need indirect costs, but experienced organizations don't. And I think the record just shows that that is completely not the case. But, in fact, the organizations that have been around for a very long time and have been conducting NIH-sponsored research since the beginning, indirect costs are part of that infrastructure. They're what make the infrastructure possible. So I guess my principal point, I think, about arbitrary and capricious review, which we got into a little bit, is just the total failure to address the reliance issue. It sort of bleeds into another aspect of arbitrary and capricious review, which is the failure to consider an important aspect of the problem. Again, the fact that you are going to hamstring research at all of these institutions, not only with respect to existing grants, but absolutely with respect to grants going forward. If the institutions are only looking to recover 15% of indirect costs in future grants, that, again, as is explained at length over and over again in the declarations, it will make it impossible for them to support the kind of research that they are able to support now. Council, let me ask you something else about that because I think there's disagreement between the parties, it seems to me, on what indirect costs actually are. So you and your clients have said indirect costs are often research costs or just costs that can't be attributed to one particular research project. And it seems that the federal government is saying that that's not what indirect costs or certainly not what indirect costs always are. They're more like overhead. Can you help us understand who's right about that? Because I did see the definition of indirect costs that was referenced in the guidance and both the definition of facilities and administration. I'm just trying to figure out just the nuts and bolts of what really counts as a direct cost. Sure, sure. So I hope that I can help with that. So I think the parties agree. I think everybody agrees that direct costs are attributable to a single project and indirect costs are attributable to more than one project. And so you're talking about, nonetheless, you are talking about, for example, buildings. When you build a new building, the facilities aspect of indirect costs helps pay for debt service and that sort of thing. So that helps the university build buildings which presumably are going to house a bunch of different laboratories with a bunch of different investigators working in them. So that's why that has to be charged as indirect costs rather than direct costs. There's also the administrative aspect, which, as my colleague mentioned, has been capped at 26% since 1991. But administrative, and that was done, by the way, through a notice and comment rulemaking, I think it's worth mentioning. But there is an entire administrative infrastructure, sort of a human infrastructure, that is necessary. It's not just the one scientist that is running a lab that makes the research possible. There's regulatory compliance. There is ethics review boards. There are people that look after animals. There are people that look after the computer systems. There's a whole sort of, again, I keep coming back to the word infrastructure because that's really what it is. Indirect costs support the infrastructure that is necessary for scientists who receive direct cost grants to run their laboratories and to make it possible for the science to happen in these institutions. Yes, go ahead. Go ahead and make your point, then I'll follow up. I was going to actually loop back to jurisdiction, so please go ahead. Would you like him to address? Okay, thank you. Could you give us a practical sense of how these deviations that the regulations clearly do contemplate, how these deviations do play out in the long history of these grants that your colleague has described? I mean, it seems to me the government rests a lot on the fact that the regulations do contemplate deviations. Those deviations may reflect reliance interests. They may affect the expectations that the awardees have because they could be subject to deviations. How have they played out historically? For example, if there's a negotiated rate that's applied for the first couple of years, we get into the third year. Could NIH say we have reasons to think that that originally negotiated rate was excessive, we want to deviate from it? Can that be done? And if so, how does that play out? So in terms of the history of deviation, as you will have seen, there is nothing in the record about that. So I don't have any sort of solid information about that. I think it's telling that the government did not put in anything about any sort of history of deviation, and for sure what we know is that there is no history, as my colleague responded to Judge Howard, there is no history of doing this on the kind of sort of across-the-board scale that's been done here. And so I think there's no doubt that exactly what is prohibited in the rider, which is the fiscal effect of the approval of deviations, that that's never been done before, to sort of substantially expand the fiscal effect of the approval of deviations. That's a really key part of that rider. And so we have no information in the record, but I don't know of anything. So if I had to guess, and it's just now speculation, it would be sort of case-by-case grants where either there was an unusual cost overrun or a cost underrun, something like that, or perhaps a small class. But I don't have any specific information about that. I wanted to just add a couple of points on the Tucker Act question. The first is that I very much agree with my colleague that APHA largely resolves this because this case clearly falls into the sort of challenge directives half of APHA and not the grant terminations half. One thing that I think is really significant from Justice Barrett's concurrence is that she acknowledges that the guidance documents in that case talk about the grants. They talk about the contracts, if you assume that grants are contracts. And there was no dispute in that case that it was those guidance documents that led directly to the terminations. And nonetheless, she says, that does not turn the case into one, quote, founded upon contract such that the Tucker Act applies. And that same principle that the mere fact that you have a contract in a case and you may even have to read the contract to understand the case, that doesn't turn it into a contract case. That's what Megapulse stands for, and then Crowley from the D.C. Circuit reiterates that, I think, in a very helpful fashion, explaining that even though your ultimate right to payment is, of course, in the contract, because if you're a government contractor, you've got a contract with the government, that's why they're going to pay you. If your complaint, as it was in Megapulse, is unrelated, is not unrelated, but is different from the contract, there the Trade Secrets Act in Crowley, a conduct that a different agency was undertaking that Crowley said was interfering with his right to payment, then you can stay in district court because you're not suing on the contract, and that's what defines the Tucker Act case. Thank you very much. Thank you, counsel. At this time, the counsel for the government, please reintroduce yourself on the record. There's a seven-minute rebuttal. I'm Jennifer Utrecht, again, for the government. There are a few points I'd like to make on jurisdiction, and then I will turn to the merits, particularly the reliance interests, that I don't believe we had an opportunity to discuss previously. As I understand it, plaintiffs have asserted two or three theories of why there is jurisdiction over this case, depending on whether you count Bowen as an independent ground for jurisdiction. The first is that plaintiffs believe that APHA leads to jurisdiction over this case, even with respect to the changes to the terms of existing grants. For reasons we've discussed previously, that's simply not true. The Supreme Court stated that the district courts vacated the termination decisions. The plaintiffs in that case, just like in this case, argued that they had identified final agency action, which was these termination notices, that those notices violated statutory and regulatory provisions. They argued, just as plaintiffs have here, that the resolution of their legal arguments, that the termination notice was unlawful, did not require looking at the terms of their contracts, did not require independent assessment of the terms. It simply said that they argued, just as plaintiffs here, that this was a case based on those statutes and regulations, and that was the sort of thing that bonded district court. The majority of the Supreme Court rejected that, and the reason that the majority of the Supreme Court rejected that, which is in the first paragraph of the court's decision, is that that termination decision, vacater of that termination decision, is an order designed to enforce relief under the contract. So to here, with respect to existing grants, the change to the terms of the contract, the limitation on the amount of money that is available to plaintiffs, vacating that portion of this announcement is an order that would require payment under the contract, and that is what it is. The court's been very clear. Just because at the end of the day the government has to pay money, that doesn't make it a contract claim. I'm struggling to understand what are the terms of the contract that are at issue here, other than the incorporation, I guess is your position, other than the incorporation of the regulations that address the issue of deviations. Other than those regulations that are incorporated, what terms of the contract are involved? I think it's answered very simply by saying that plaintiffs have no statutory or regulatory right to any money. It is the contract themselves, the grant agreements between the federal government and these plaintiffs that entitle them to any payment of indirect costs at all. And so if we're changing the terms of those grant agreements, that's of course a claim that is based in contract. This isn't divorced from or independent from their existing contracts. They have no right to any payment of indirect costs but for this agreement between the federal government and themselves. I'm just trying to understand the full force of your argument. If these plaintiffs who have existing grants can't challenge the supplemental guidance because they have existing grants, and you also suggested that organizations or individuals who don't have existing grants would for a different reason not be able to bring a challenge because in your view they don't have Article III jurisdiction. Is there any set of plaintiffs that could actually challenge the supplemental guidance and for instance bring a claim based on violation of the appropriations? I understand that you disagree with the merits of that claim, but who could challenge? Maybe I should clarify because I think our position is a little more nuanced than that and I don't think this court has to reach as broadly as your Honor's question suggests. I know, but it would be helpful to understand how the forum goes in your view. I think in our view what plaintiffs have brought here is essentially a claim about their existing grants. If they had brought a different claim, which was challenging only the future grants, then the district court would assess the jurisdiction of that and the merits of that independently. And so because the district court didn't hear, and I don't fault the district court for doing that because it did not have the benefit of the Department of Education or APHA, we think that the relief order was outside of its jurisdiction of the APA, and at a minimum we would suggest that the court should remand back to the district court to assess the existing grant problem separately from the future grant problem because that's how the district court in APHA has outlined this problem. I'd also note, just to try and see, this is a hypothetical, but just assume you have a group of prospective applicants. The government has put out a Notice of Funding Opportunity, and organizations or universities that want to apply for the funding would apply, but for the supplemental guidance because they feel like they cannot do the research with 15% indirect cost cap. They have no existing contracts. Would they be able to bring that claim in federal district court in the government's view? If they brought that claim in the district court, the question of standing and any other justiciability concerns would be addressed. Let's just assume the conclusion. The district court concluded they had standing. Would the district court then go ahead and be able to decide their APA claim? In your hypothetical, the district court has decided they've had standing and they're only challenging future grants? They want to apply. As I think I've represented, we don't think that the Tucker Act would preclude a challenge to an announcement as it applies to future grants. The Tucker Act argument only applies to plaintiff's challenge because the relief the district court ordered here was vacant or a change to the terms of their existing grants. It was ordered designed to provide payments under these contracts, and that is the kind of claim that belongs in the core federal claims under the Tucker Act. Let me ask you one other question. Another hypothetical is to say one of the organizations that has a current existing grant, there's a woman who's the lead researcher, and the NIH enacts supplemental guidance saying that from now on it's not going to fund research where the lead researcher is a woman, and she wants to bring suit because she wants to be able to both apply for grants in the future and continue with her existing grant. Can she bring that claim in federal district court? Can she sue in federal district court? What's the government's view? The district court would not have jurisdiction over any portion of announcement that changed the terms of existing grants because that would be a claim that belonged to the core federal claims. The Tucker Act would not preclude a challenge to a generally applicable policy that applied to future grants. Go ahead. I'm very short on time, so a few points in response to Plaintiff's argument about reliance interests. Please go ahead. A few points with respect to reliance interests. The first is, of course, that reliance interests can only apply to this existing grant problem. Plaintiffs can't have any substantial cognizable reliance interests with respect to future grants that haven't been issued. I think that only underscores that this case really is about existing grants and really does belong in the core federal claims. The second, of course, Your Honor, is that even with respect to existing grants, any reliance interests have to be cabined by the fact that there is a regulation that permits these deviations. It may be the case that plaintiffs have historically received a certain amount of money based on their negotiated rates, but the regulation informs them that there can be deviations in the future that they can't expect forever to be able to continue to receive the same kind of money. I've heard plaintiffs articulate at length that they don't think that there was a sufficient consideration of the reliance interests in the policy. The reasons we explain are brief. I think the NIH has acknowledged those reliance interests and explained why it has nonetheless gone forward with this change. Of course, if the court were dissatisfied with that, the remedy would be to remand to the agency not, as the district court said on a much broader basis, to say that the NIH could never announce a deviation for a class of awards because that would be inconsistent with what the regulation says. I finally would like to note that with respect to the appropriations writer, just to reiterate and to briefly address the plaintiff's reliance on the OMB statement, with respect to the text of the appropriations writer does not say and has never said in any of the times it's been reenacted that there can never be deviations. That's not what Congress has told us to do. The OMB statement that said we are precluded from this, of course, reflects the fact that OMB believed there couldn't be an across-the-board reduction, which was what was originally proposed. OMB never said that it couldn't approve any deviations. It would be inconsistent with the text of the regulation, which plainly permits deviations. Again, if we are understanding the text in the legislative history in this context, the appropriations argument essentially boils down to an argument that we didn't follow the text of the regulations. It's not an independent basis for a plaintiff's position, and we have followed the regulations here. The regulations permit a deviation. We announced why we've made this deviation, and that's all that the regulation requires. Thank you, Counsel. Thank you. That concludes our Q&A.